UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.          CASE NO. 8:11-cr-548-T-33MAP

IHAB "STEVE" BARSOUM
_____/

## REPORT AND RECOMMENDATION

  The Defendant, a pharmacist accused of distributing oxycodone outside the course of his professional practice, moves to suppress evidence agents seized from his home after his arrest pursuant to an arrest warrant. *See* doc. 24.[1] In sum, the Defendant contends Drug Enforcement Administration ("DEA") agents illegally entered his home after arresting him outside its threshold, illegally conducted a protective sweep without articulable facts that anyone inside the home posed a danger to the officers at the scene, and that the Defendant's subsequent consent was coerced or tainted by the prior illegal police conduct. After a hearing on the matter, I recommend the motion be granted.

  *A. Facts*

  On October 26, 2011, the grand jury returned a true bill charging the Defendant with conspiracy and five counts of distributing oxycodone outside the course of his professional practice. That same day, DEA Special Agent Brian Zdrojewski, a member of a tactical diversion squad tasked with investigating drug trafficking and money laundering offenses

---

[1] The district judge referred the motion to me for a report and recommendation. *See* 28 U.S.C. § 636.

specifically related to the diversion of pharmaceutical-grade controlled substances, presented me two applications for search warrants based on the same affidavit, one for the Defendant's pharmacy and the other for the Defendant's residence. I authorized the warrant for the pharmacy (Platinum Pharmacy & Compound, also known as S&S Pharmacy, located at 14937 Bruce B. Downs Blvd., Tampa, Florida) but denied the application for the Defendant's residence finding it lacked probable cause.

Two days later, Agent Zdrojewski and a number of agents met for an early pre-arrest session to plan the arrest warrant's execution. By then, Zdrojewski knew considerable details about the Defendant's background, his lifestyle, and who lived with him. For about a year, the DEA had investigated the Defendant for diverting oxycodone tablets. In January 2011 and for the next six months, a DEA source, at Zdrojewski's direction, began illicitly purchasing oxycodone from the Defendant.[2] Agents also had monitored the Defendant's comings and goings for months via a pole camera aimed at his pharmacy and had periodically surveilled his residence. They knew he was married to a pharmacist, had two young children, and had no prior criminal record, not even an arrest.[3] Although DEA reasonably knew the Defendant's habits, Zdrojewski decided his team would attempt to arrest the Defendant at his residence and then seek the Defendant's consent to search the

---

[2] This information is available from Agent Zdrojewski's affidavit to his application for a search warrant directed to the pharmacy. *See In the Matter of the Search of Platinum Pharmacy & Compound,* Case No. 8:11MJ1544MAP.

[3] Agent Zdrojewski assigned one member of the arrest team, a female deputy, to monitor the children until suitable, familial arrangements could be made for their care.

2

place.[4]  Yet, none of the information obtained to date nor anything said at the briefing prompted a reasonable belief in any of the participants at the meeting that the Defendant or anyone else at the residence would pose a danger to the team during the arrest.

At about 6 a.m. on a rainy morning, Agent Zdrojewski and eleven others approached the Defendant's large home.  All wore DEA raid jackets or were uniformed.  And all were armed, including two with AR-15s.[5]  Zdrojewski pounded on the front door and loudly said "DEA," as other agents went around the back.  No one answered. Again he pounded on the door.  Soon thereafter, the agents could see lights turning on and then hear the Defendant's voice over the intercom.[6]  Once more, Zdrojewski strongly announced his purpose.  Not long after, the Defendant opened the door wearing only gym shorts.  Agents, with their weapons drawn, pulled him out onto the portico, turned him against the wall, patted him down, and handcuffed and shackled him.[7]  Zdrojewski next moved the Defendant inside the house and

---

[4] Although a pole camera had monitored the Defendant's pharmacy for about three to four months, Agent Zdrogewski testified that the had never noticed when the Defendant customarily arrived for work.  I find this difficult to accept as the Defendant was the focus of the investigation and the very reason for the extensive video monitoring.

[5] An AR-15 is the civilian equivalent to the military's M-16.

[6] A fair assumption about the Defendant's failure to immediately respond to Zdrojewki's forceful knocking is that the Defendant and his two children were still sleeping.

[7] Only two witnesses testified at the suppression hearing, Agent Zdrojewski and the Defendant, and their accounts conflicted, in part, about what occurred.  But there is not any disagreement that Zdrojewski arrested the Defendant as soon as he opened the door.  And I credit the Defendant's account that he was pulled outside his home's threshold to the portico.  Although Zdrojewski seems to contend he shackled the Defendant later that morning, I credit the Defendant's account that agents shackled his ankles and his waist soon after cuffing him.

3

seated him in the dining room in an effort to secure the Defendant's consent for a search of the residence. Meanwhile, a group of agents with their weapons drawn fanned through the rooms in a protective sweep. The Defendant's children, ages ten and eleven, anxiously expressed concern for their father's safety.[8]

At this point, the accounts vary as to the sequence of events. Zdrojewski contends he read the Defendant the *Miranda* warnings, then asked the Defendant for consent to search, adding that the Defendant did not have to give his consent. He provided the consent form to the Defendant, and the Defendant signed the form. The Defendant's version differs, particularly as to the timing of the *Miranda* warnings. Soon after being cuffed, according to the Defendant, Zdrojewski told him – "You are my Pablo Escobar!" and "We got you. You are going away for twenty-five years." The agent then asked if the Defendant wanted to cooperate. A diversion agent (Flagg) approached the Defendant asking the Defendant to surrender his DEA registration. The Defendant refused. Zdrojewski then showed the Defendant a consent-to-search form, which the Defendant signed. Sometime after this, Zdrojewski gave the Defendant the *Miranda* warnings.

After the Defendant signed the consent-to-search form, Zdrojewski asked him if he had any firearms, drugs, or money in the house. The Defendant answered that he had money in a coat pocket, agreeing to show Zdrojewski its location. Still shackled, the Defendant led agents to the coat. After discovering the money was not there, he remembered leaving it in

---

[8] One child said, "Please do not kill my daddy."

4

a bag by the master bathroom sink. In the bag agents discovered about $44,000, including $1,800 used in a controlled buy. Agents also searched the Defendant's papers and seized four personal computers, which were later mirror-imaged and returned to the Defendant.

*B. Discussion*

The Fourth Amendment bars only unreasonable searches and seizures, *Maryland v. Buie,* 494 U.S. 325, 329 (1990). A search of a suspect's home without a warrant is presumptively unreasonable except for a few specific and well-delineated exceptions. *Payton v. New York*, 445 U.S. 573, 586 (1980). Consent is one such exception; so is a properly limited protective sweep of an area incident to a person's arrest. *Buie,* 494 U.S. at 337; *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The analysis of these exceptions as applied to the facts here are intertwined.

*1. the protective sweep*

In *Maryland v. Buie,* the Supreme Court confronted the legality of a "protective sweep" of a defendant's residence incident to his arrest.[9] Analogizing the purpose of the sweep to a protective frisk under *Terry* or a protective search under *Long* after a roadside encounter, the Court held that a properly limited protective sweep is constitutionally permissible if the sweep occurs in conjunction with an in-home arrest and the searching officer possesses a reasonable belief based upon specific facts that the area to be searched

---

[9] Neither side cited the *Buie* case in its papers, although the Defendant argued at the suppression hearing that the agents had failed to meet its standards.

5

harbors an individual posing a danger to those on the arrest scene. 494 U.S. at 337.[10] The sweep must be a cursory one, lasting no longer than necessary to check those spaces where someone could hide and limited in duration to that time necessary to dispel the reasonable suspicion of danger. *Id.* Moreover, the government bears the burden of demonstrating that a reasonably prudent officer, based upon the facts presented and the reasonable inferences derived from those facts, would believe that the area to be searched harbors an individual posing a danger to those on the arrest scene. 494 U.S. at 334.

Against these standards, the government offers nothing to suggest the Defendant or anyone in the residence (his family) likely posed a danger to the agents, and certainly nothing that a reasonably prudent officer would accept. Instead, the main reason the government seemingly gives is that the agents took the Defendant inside to avoid the rainy morning and to offer him the opportunity to put on some clothes and shoes. Frankly, I find another reason is more obvious. As Agent Zdrojewski admitted, he wanted to secure the Defendant's consent to search his house. Indeed, he specifically chose that location for the Defendant's arrest, as opposed to the pharmacy, to increase his odds that he could search the residence.[11]

---

[10] *Terry v. Ohio,* 392 U.S. 1 (1968), authorizes the limited pat-down of a suspect for weapons if a reasonably prudent officer would be warranted in believing he was dealing with an armed and dangerous individual. *Michigan v. Long*, 463 U.S.1032 (1983), applied this reasoning to the sweep of passenger compartments of an automobile during a roadside encounter with a suspect believed to be dangerous.

[11] I do not suggest that this tactic is illegal; on the contrary, the approach is commonplace. But as *Payton* and *Buie* make clear, an arrest warrant and a search warrant are not synonymous. Without a search warrant, the government must present an exception to the warrant requirement.

Because I find the government has failed to meet its burden under *Buie*, I find the agents' entry into the Defendant's house and their subsequent protective sweep illegal.

    *2. consent*

Where consent follows a prior illegal activity, two questions must be answered for deciding if the evidence should be suppressed: was the consent voluntary; and if so, was the consent the product of an illegal entry. *United States v. Delancy,* 502 F.3d 1297, 1308 (11th Cir. 2007); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963). The government bears the burden on both issues. *Delancy*, 502 F.3d at 1308. And it contends the Defendant voluntarily agreed to the search.

The voluntariness inquiry is a factual one assessed from the perspective of the "totality of the circumstances." *Schenckloth v. Bustamonte,* 412 U.S. 218, 227 (1973). In evaluating the totality of the circumstances, a court should look at several "indicators": "the presence of coercive police procedures; the extent of the defendant's cooperation with the officer; the defendant's awareness of his right to refuse consent; the defendant's education and intelligence; and the defendant's belief that no incriminating evidence will be found." *United States v. Simms,* 385 F.3d 1347, 1355 (11th Cir. 2004) (quoting *United States v. Purcell,* 236 F.3d 1274, 1281 (11th Cir. 2001)).

Although the circumstances surrounding the Defendant's arrest were purposely intimidating, I find the Defendant freely consented to the search. I do not credit the Defendant's account that the show of force intimidated him into consenting or that he failed

to read the consent form.[12] Nor do I credit the Defendant's account that he simply consented because he thought the agents had already searched his huge residence during the protective sweep. The Defendant is well educated and had the poise to quickly reject the diversion officer's overture that he surrender his controlled substance registration. That rejection notably preceded the Defendant's decision to give consent to search.

### 3. *fruit of the poisonous tree*

Even with the Defendant's voluntary consent, the government must still prove his consent is sufficiently distinguishable from the taint of the illegality (the illegal entry and sweep). Namely, is the consent such an act of free will that it purges the primary taint of the illegal reentry? Or, is the connection between both acts so attenuated that the taint has dissipated? *Delancy*, 502 F.3d at 1309. A number of factors guide this analysis: the temporal proximity of the seizure and consent; the presence of intervening circumstances; and "particularly, the purpose and flagrancy of the official misconduct." *Id.* These factors are not exhaustive, but they are useful for the basic inquiry – to pragmatically evaluate the extent the agents' illegal conduct caused the Defendant's response. *Id.* at 1309-10.

---

[12] The consent form includes three items to read:

(1) I have been asked to permit special agents of the Drug Enforcement Administration to search: (Describe the person, places or things to be searched.)
(2) I have not been threatened, nor forced in any way.
(3) I freely consent to this search.

8

Admittedly, no bright-line rule defines the temporal factor. If the period is very short, that circumstance weighs in favor of exclusion. *Id.* at 1310. In my view, both sides' time lines of the events of that morning are likely inaccurate, which is probably understandable. Irrespective, a reasonable view of the testimony is that the Defendant's consent occurred a short time after the agents concluded their protective sweep (within a few minutes). This weighs in the Defendant's favor, but it alone is not convincing.

The intervening circumstances, like the temporal factor, is not dispositive for answering whether the agents' illegal conduct caused the Defendant's response. The Defendant remained handcuffed and shackled during the interim; Agent Zdrojewski pointedly predicted the severity of the Defendant's arrest; and diversion officer Flagg asked the Defendant to surrender his DEA registration, which the Defendant refused. Of greater significance is the fact that the Defendant signed a consent form. That event, even on the heels of the illegal entry, weighs in the government's favor. *Id.* at 1312 (consent, while not dispositive supports attenuation).

The final factor – the purpose and flagrancy of the government conduct – is the most straightforward. *Id.* at 1312. And because it implicates the policy considerations supporting the exclusionary rule, it is the most important. *Id.* at 1312, 1314. Guided by *Delancy*, this factor weighs against the government:

> If the police entry had been made for the purpose of gaining consent to conduct a full-scale search, we would be bound to find the consent tainted. Indeed, when the police act with the express purpose of exploiting an illegal action, the causation is so obvious that no real attenuation analysis is even

9

necessary.[13]

As already noted, Agent Zdrojewski admitted he wanted to secure the Defendant's consent to search his house and chose that location for the Defendant's arrest to increase his odds that he could search the residence. His entry into the home without the Defendant's consent, without a search warrant, and without articulable facts that anyone inside posed a danger to the officers at the scene made that entry illegal. The facts here fall within *Delancy's* specific prohibition and cause me to find the Defendant's consent tainted and the subsequent search invalid per the Fourth Amendment.

### 4. scope of the consent

By finding the consent fatally tainted, the remaining issue– that the agents' seizure and search of the Defendant's computers exceeded the scope of his consent – is moot. Nonetheless, given the nature of this report, I address the issue briefly.

The standard for measuring the extent of an individual's consent to search under the Fourth Amendment is that of "objective" reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the individual searched. *Florida v. Jimeno,* 500 U.S. 248, 250-51 (1991) (finding consent to search car reasonably applied to contents of paper bag in the interior of the car). And the search's scope per that consent is generally defined by the search's purpose or expressed object. *Id.* at 251. As to these matters, the government bears the burden. *United States v. Blake,* 888 F.2d 795, 800

---

[13] *See* 502 F.3d at 1312 (citing *Florida v. Royer,* 460 U.S. 491, 505 (1983) (opinion of White, J.)).

(11th Cir. 1989); *see also United States v. Rios*, 443 Fed.Appx. 433, 437 (11th Cir. 2011) (unpublished).

In its papers, the government stated the Defendant consented to the search of his computers when asked by agents (doc. 29 at p. 10). But at the suppression hearing, the government failed to adduce any such evidence.[14] The Defendant, however, testified that he did not give Agent Zdrojewski consent to take the four computers. Accordingly, given the Defendant's unrebutted testimony, the issue that remains is what the typical reasonable person would have taken from the events surrounding the Defendant's initial consent to the search of his residence. Would the Defendant's consent be reasonably interpreted to also include the seizure of the computers and the search of their files? My conclusion is no. Agent Zdrojewski made clear to the Defendant the focus of their inquiry – drugs, money, and firearms. Nothing about the agent's discussions preceding the consent suggested the agent planned to seize any computer, much less search them offsite. The agents' seizures and the subsequent search offsite exceeded the Defendant's consent. *See United States v. Carey*. 172 F.3d 1268, 1274 (10th Cir. 1999) (consent to search apartment did not carry over to the contents of the computer files); *United States v. Turner*, 169 F.3d 84, 87-88 (1999) (consent to look for suspect or signs of an intruder did not extend to search of computer).[15]

---

[14] Neither side offered any testimony as to the location of the computers within the house, and it is unclear to me which computer, if any, belonged to the Defendant. I find it reasonable to presume that some of them may have belonged to his wife or children.

[15] I recognize that in *Florida v. Jimeno*, the Court stated that "[a] suspect may of course delimit as he chooses the scope of the search to which he consents." 500 U.S. at 251.

*C. Conclusion*

Because I find the agents entered the Defendant's residence illegally and for the specific purpose of engendering the Defendant's consent to search, I recommend the Court grant the Defendant's motion to suppress the evidence seized after a search of his residence (doc. 24).[16]

IT IS SO REPORTED at Tampa, Florida on April 5, 2012.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. § 636(b)(1).

cc: Hon. Virginia M. Hernandez Covington
Counsel of Record

---

Nonetheless, the scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a warrant. *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990).

[16] The Defendant, via his motion to suppress, also moves for the return of the cash seized from his residence. The government says this money has been administratively forfeited (doc. 54). For the reasons stated in the government's response, that part of the Defendant's motion should be denied.